LHPNJ, LLC vs. JEFFERSON DEVELOPMENT PARTNERS, LLC, MISC 16-000652

































 
 LHPNJ, LLC, as successor-in-interest to the City of Taunton, Plaintiff, v. JEFFERSON DEVELOPMENT PARTNERS, LLC, et al., Defendants
 MISC 16-000652 
 OCTOBER 18, 2021
BRISTOL, ss.
VHAY, J.
FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER (Rule 52, Mass. R. Civ. P.)














 Plaintiff City of Taunton filed an action in this Court in April 2016, pursuant to G.L. c. 60, § 65. In its complaint, the City sought to foreclose all rights of redemption in a 42- acre parcel on Whittenton Street in Taunton, Massachusetts (the "Property"). The City recorded a tax taking against the Property (the "Tax Title") in August 2015. 





 The Court discussed the background of this case and its current principal parties, plaintiff LHPNJ, LLC and defendant Whittenton Holdings, LLC ("Whittenton"), in a published decision disposing of the parties' motions and cross-motions for summary judgment. See LHPNJ, LLC v. Jefferson Development Partners, LLC, 29 LCR 99 (2021) ("LHPNJ I"). The Court assumes the reader of this decision is familiar with LHPNJ I. 





 Following the issuance of LHPNJ I, LHPNJ and Whittenton appeared for trial on September 16, 2021, on two issues: (1) Did the City perfect its alleged lien on the Property for charges arising out of what LHPNJ I calls the Taunton Fire Department's first "fire watch" on the Property (and if so, what is the amount of that lien)? (2) Did the City perfect its alleged lien for charges arising out of what LHPNJ I calls the Department's second fire watch (and if so, what is the amount of that lien)? 





 Having heard the parties' witnesses, having accepted their stipulations of fact, having reviewed the parties' evidence, and having heard the arguments of their counsel, the Court holds that the Department conducted five fire watches on the Property between 2011 and 2015, and not just two watches. The Court further holds that the City perfected its lien with respect to only two of those watches. The amount of the perfected liens is $88,349.59. 





 Pursuant to Rule 52, the Court FINDS the facts recited above as well as those that follow. If any fact found in this decision conflicts with what LHPNJ I states is an undisputed fact, the facts found in this decision supersede those described in LHPNJ I. 





 1. The Property is home to the Whittenton Mill, a historic textile mill. The Mill consists of numerous interconnected buildings of various dimensions, as well as a smokestack that more recently has been used to house cellular-telephone equipment. 





 2. The Property's owner is defendant Jefferson Development Partners, LLC ("Jefferson Development"). Whittenton holds a first mortgage on the Property. 





 3. At all times relevant to this case, the Mill was in a state of disrepair. That neglect extended to the Property's fire-alarm and fire-suppression systems. Some of the Mill buildings nevertheless had tenants. The number and types of tenants varied, as did their locations within the Mill. 





 4. Because the Mill's alarm and fire-suppression systems weren't functioning safely, and because the Mill had tenants, the City's Fire Department ordered a fire watch at the Mill starting on December 19, 2011 (the "2011 Watch"). That watch, and subsequent ones, consisted of a single City firefighter stationed on the Property, outside of the Mill, in a Department vehicle. The firefighter had fire-suppression gear and a means of contacting the Department in the event of a fire. The Department paid such firefighters at rates set under their union contracts. They performed such work as "extra" shifts; the Department didn't reassign anyone from regular "station" shifts to any of the fire watches. 





 5. The Fire Department advised Jefferson's owner, David Murphy, of the Department's desire to impose the 2011 Watch prior to ordering it, but it did not send Jefferson a written order of abatement in advance of imposing the 2011 Watch. (Four days after the 2011 Watch began, the Department hand-delivered to Jefferson a Non-Criminal Fire Code Violation Notice (the "2011 Violation Notice"). See LHPNJ I, 29 LCR at 101; LHPNJ's Statement of Material Facts and Appendix, Exhibit B to Exhibit 23 (Oct. 16, 2020) ("LHPNJ's Appendix); Whittenton's Response to Plaintiff's Statement of Additional Facts, ¶ 57 (Nov. 9, 2020) ("Whittenton's Response," admitting Exhibit B to Exhibit 23). That notice informed Jefferson that the Department was fining Jefferson $100.00 for fire-code violations, but the notice didn't warn Jefferson that if it didn't abate the cause of the violation, the Department would impose a mandatory fire watch.) 





 6. Mr. Murphy agreed on behalf of Jefferson to the imposition of the 2011 Watch. He also agreed, on behalf of Jefferson, to pay for the 2011 Watch. Accordingly, consistent with the Department's regular practices, at the end of each week of the 2011 Watch, the Department prepared and mailed to Jefferson an invoice that identified, by day, the firefighters assigned to the Watch, the number of hours they worked, and their wages. The invoices also included a service charge equal to 10% of the wages paid. 





 7. The 2011 Watch began December 19, 2011 and ended January 3, 2012. The Department ended the 2011 Watch once the Department was satisfied that Jefferson had repaired its alarm and fire-suppression systems. 





 8. A second fire watch (the "Early 2012 Watch") began January 13, 2012 and ended February 15, 2012. The Department imposed the watch after it became clear the repairs discussed in Finding #7 didn't hold. As was the case with the 2011 Watch, however, the Department didn't send Jefferson a written order of abatement before imposing the Early 2012 Watch: the Department merely spoke with Mr. Murphy, who agreed again that Jefferson would pay for the watch. The Department again invoiced Jefferson weekly for the Early 2012 Watch. The Department ended the Early 2012 Watch once the Department was satisfied that Jefferson had repaired its alarm and fire-suppression systems. 





 9. A third fire watch (the "Late 2012 Watch") began December 5, 2012 and ended December 16, 2012. The Department imposed the watch after the Property's alarm and fire suppression systems malfunctioned again. But unlike what occurred with the 2011 and Early 2012 Watches, in the case of the Late 2012 Watch, the Department did deliver to Jefferson a written order of abatement prior to starting the watch. That order came in the form of a letter from the Department to Jefferson dated December 5, 2012 (the "2012 Abatement Notice"). See LHPNJ's Appendix, Exhibit E to Exhibit 23; Whittenton's Response at ¶ 64 (admitting notice). 





 10. After being sent the 2012 Abatement Notice, Mr. Murphy agreed again that Jefferson would pay for the Late 2012 Watch. The Department invoiced Jefferson weekly for that watch. The Department ended the Late 2012 Watch once the Department was satisfied that Jefferson had repaired its alarm and fire-suppression systems. 





 11. A fourth fire watch (the "Fourth Watch") began January 4, 2013 and ended March 27, 2014. The Department imposed the watch following an order of notice dated January 3, 2013, which described the Property's ongoing inoperable or malfunctioning alarm and sprinkler systems. Jefferson agreed to pay for the Fourth Watch, and the Department invoiced Jefferson weekly for the Fourth Watch. 





 12. In late October 2013 (but no earlier than October 19, 2013), the City sent Jefferson a statement of the total amount due for unpaid fire details and fire prevention fines through October 19, 2013 (the "2013 Statement," Trial Exhibit 9, pages 2-23). The 2013 Statement included charges for the wages and service fees set forth on the Department's invoices to Jefferson for the 2011 Watch (totaling $9,097.49), the Early 2012 Watch (totaling $21,772.75), and the Late 2012 Watch (totaling $3,190.40). The balance consisted of $5,500.00 in fire-prevention fines and amounts invoiced through October 19, 2013 for the ongoing Fourth Watch. The total shown on the 2013 Statement was $284,884.48. 





 13. On November 8, 2013, the City recorded at the Bristol North Registry of Deeds (the "Registry") a Statement of Claim and Municipal Charges Lien ("Statement of Claim #1"), in the amount of $284,884.48. The City took the actions described in this Finding and Finding #12 out of concern that Jefferson might file for bankruptcy. The City believed that taking such actions would improve the City's chances of collecting Jefferson's unpaid fire-watch charges and other bills. 





 14. On January 14, 2014, Jefferson filed for bankruptcy, while the Fourth Watch was still underway. 





 15. On February 4, 2014, the City recorded at the Registry a Statement of Claim and Municipal Charges Lien ("Statement of Claim #2"), in the amount of $102,155.47. Statement of Claim #2 sets forth charges for unpaid fire details from October 20, 2013 through February 1, 2014. 





 16. In March 2014, Jefferson negotiated an end to the Fourth Watch by promising the Department that it would hire a private firm to perform watch duties. The Department and Jefferson agreed that if Jefferson terminated the firm, the fire watch would be "reestablished." See LHPNJ I, 29 LCR at 101; LHPNJ's Appendix, Exhibit 3 to Exhibit 23; Whittenton's Response at ¶ 70. [Note 1] 





 17. The City did not send Jefferson, after March 27, 2014, a statement of the total amount due for the Fourth Watch. That's because, at some point after recording Statement of Claim #2, City officials became concerned that efforts by the City to collect for fire watches at the Property, other than filing a proof of claim in Jefferson's bankruptcy case (which the City did, in May 2014), would violate the federal automatic bankruptcy stay. [Note 2] The City's May 2014 proof of claim characterized as "secured" only the fire-watch amounts contained in Statement of Claim #1. It characterized watch costs incurred after those covered in Statement of Claim #1 (which included costs incurred only through October 19, 2013) as "unsecured" or "post-petition unsecured." 





 18. In May 2015, the trustee of Jefferson's bankruptcy estate moved in the U.S. Bankruptcy Court for an order allowing the trustee to abandon the Property. 





 19. As of May 2015, Jefferson (with the trustee's approval) was continuing to pay a private firm to perform fire-watch duties at the Property. The City anticipated that Jefferson would terminate those services if the Bankruptcy Court approved the trustee's motion to abandon the Property. The City thus took steps to reimpose the Department's fire watch in the event Jefferson's private watch ended. Jefferson agreed that the Department should reinstate its fire watch if private services ended. 





 20. The Bankruptcy Court granted the trustee's abandonment motion on June 19, 2015. Jefferson's private fire watch immediately ended. Another Department fire watch (the "Fifth Watch") began the same day and ended on September 8, 2015. (The Department also sent Jefferson a violation notice on June 19, 2015, directing Jefferson to repair its systems.) The Department invoiced Jefferson weekly for the Fifth Watch. The City also sent Jefferson, shortly after September 8, 2015, a summary of all invoiced charges for the Fifth Watch (the "2015 Statement," Trial Exhibit 1, page 35). Jefferson received the 2015 Statement shortly after the Fifth Watch ended. The charges on the 2015 Statement total $85,159.19. 





 21. The Fifth Watch ended once Jefferson agreed to end all use of the Mill by tenants other than in one heated building, and to install entry ("burglar") alarms. 





 22. The trustee's abandonment of the Property relieved City officials of their concerns about collecting unpaid taxes, fire-watch charges, and other expenses from Jefferson without violating the automatic stay. Thus, in August 2015, the City recorded a taking of the Property for unpaid taxes (including unpaid fire-watch charges) for the City's fiscal year 2014. 





 23. The City also recorded at the Registry, on September 21, 2015, two things. The first was an Updated, Revised, and Confirmatory Statement of Claim and Municipal Charges Lien ("Statement of Claim #3"). Statement of Claim #3 purported to cover all fire-watch costs from October 20, 2013 through April 5, 2014. The Statement showed as deductions four payments made by Jefferson that the City applied to fire-watch charges Jefferson incurred after it had filed for bankruptcy. The net amount claimed on Statement of Claim #3 is $88,603.10. 





 24. The City's second recording on September 21, 2015 was a Statement of Claim and Municipal Charges Lien ("Statement of Claim #4") for unpaid fire details from June 19, 2015 through September 10, 2015. The amount shown on Statement of Claim #4 is $85,159.19, the same amount shown on the 2015 Statement. 





*.*.* 





 In LHPNJ I, this Court held that a municipality is permitted to impose a fire watch (and later roll the costs of that watch into a property-tax lien) if it follows certain statutory steps. 





First, 





 [t]he . . . head of the fire department or any person to whom . . . the head of the fire department may delegate his authority in writing may . . . enter into buildings and upon premises . . . within their jurisdiction and make an investigation as to the existence of conditions likely to cause fire. [Second, t]hey shall, in writing, order such conditions to be remedied . . . . [Third, n]otice of such order shall be served upon the owner . . . by a member of the fire or police department. [Fourth, i]f said order is not complied with within twenty-four hours, the person making such order, or any person designated by him, may enter into such building or upon such premises and . . . abate such conditions at the expense of such owner or occupant. Any expense so incurred by or on behalf of . . . any city . . . shall be a debt due . . . the city . . . upon completion of such . . . abatement and the rendering of an account therefor to the owner. 





LHPNJ I, 29 LCR at 102, quoting G.L. c. 148, § 5. LHPNJ I further holds that, under c. 148, § 5 and the version of c. 139, § 3A that applies to this case, 





 (a) charges incurred by a fire department to abate hazards become a "debt due" to the municipality "upon [i] the completion of such . . . abatement and [ii] the rendering of an account therefor to the owner"; and (b) "such debt, together with interest thereon . . ., shall constitute a lien on the land upon which the structure is . . . located if [i] a statement of claim, [A] signed by the [head of the fire department], [B] setting forth the amount claimed without interest [ii] is filed, within ninety days after the debt becomes due, with the register of deeds for record . . . in the county . . . where the land lies." 





LHPNJ I, 29 LCR at 103 (footnote omitted). "A municipality that fails to comply with all of the steps necessary for perfecting a § 5 lien loses the lien, and may not add to a property's § 68 tax foreclosure redemption amount the value of that lien." LHPNJ I, 29 LCR at 103 (footnote omitted). 





 While LHPNJ I assumed that there had been two fire watches at the Property, LHPNJ I also noted LHPNJ's argument, which the Court accepted, that "abatement charges incurred over a period of days don't become due daily. Instead, the earliest such charges can be due is the day that marks the 'completion' of the abatement effort." Id. At trial, LHPNJ changed its position, and urged the Court to treat the 2011 Watch, the Early 2012 Watch, the Late 2012 Watch, and the Fourth Watch as one continuous watch. Relying on the testimony of the City's Fire Chief, the Court finds that the watches were separate events. Each began because the Property's alarm and sprinkler systems weren't working, but each ended for distinct (and different) reasons. The first three ended when Jefferson repaired its alarms and sprinklers. The fourth ended when Jefferson agreed to hire private watch personnel. It's true that the Early 2012 and the Fourth Watches began shortly after completion of the repairs done to abate the causes of, respectively, the 2011 and Late 2012 Watches, but the substantial gap between the Early 2012 and Late 2012 Watches shows that sometimes Jefferson's repairs worked. That's why Department officials reasonably agreed to terminate the first three watches. The lengthier Fourth Watch further shows that Department personnel understood that they could maintain a watch indefinitely if Jefferson didn't make repairs. 





 The Court thus will not treat the first four watches as one continuous watch. Instead, the Court concludes that five watches occurred in this case: the 2011 Watch, the Early 2012 Watch, the Late 2012 Watch, the Fourth Watch, and the Fifth Watch. The Court now examines whether the City took each of the steps the statutes require to roll into the Property's real-estate tax bills the expenses the Department incurred for those watches. 





 The 2011 and the Early 2012 Watches. The Court holds LHPNJ failed to prove at trial that, before the Department started the 2011 and the Early 2012 Watches, the Department provided Jefferson "in writing, [an] order [that unsafe] conditions . . . be remedied," that notice of such an order was "served upon [Jefferson] by a member of the fire or police department," or that the Department entered the Property to begin either of the Watches after Jefferson failed to comply with a properly drafted and properly served abatement order. The summary-judgment and trial record show that the Department served Jefferson with proper c. 148, § 5 orders prior to starting the Late 2012 and Fourth Fire Watches. LHPNJ failed to prove at trial that similar orders issued prior to the 2011 and Early 2012 Watches. LHPNJ thus has not shown that the City perfected its lien for charges relating to the 2011 and Early 2012 Watches. [Note 3] 





 The Late 2012 Watch: LHPNJ established at summary judgment that, prior to instituting what this Decision calls the Late 2012 Watch, the Department sent to Jefferson the 2012 Abatement Notice. The Court holds that notice satisfied c. 148, § 5's pre-fire-watch notice requirements. The Court finds that the Department served the notice on Jefferson, and that Jefferson didn't abate within 24 hours the conditions identified in the notice. The Court holds that the City "render[ed] an account therefor" to Jefferson, for the Late 2012 Watch, via the 2013 Statement. The Court holds that the City's recording of Statement of Claim #1 on November 8, 2013, satisfied the statutory requirement that such statements be filed within 90 days after a municipality has rendered to the property owner an account for a completed abatement. Last, the Court holds that the amount of the expenses included in Statement of Claim #1 for the Late 2012 Watch is $3,190.40. 





 The Fourth Watch. As with the Late 2012 Watch, the Department properly gave Jefferson advance notice of the Department's intent to impose the Fourth Watch. See Finding #11. But for the reasons explained in Finding #17, the City either chose not to send, or neglected to send, Jefferson an accounting for the Fourth Watch once it had ended. And since the City didn't send Jefferson an accounting for the Fourth Watch, the charges for that watch never became a "debt due" to the City under c. 148, § 5. It follows that the City's recording of Statements of Claim ##1-3 didn't perfect the City's inchoate lien for charges incurred for the Fourth Watch. The City's May 2014 proof of claim in the Jefferson bankruptcy seems to acknowledge that result: it characterizes the City's claims as "unsecured." LHPNJ thus hasn't proven that the City perfected its lien for charges relating to the Fourth Watch. 





 The Fifth Watch. The Court holds that, under the terms of the March 2014 agreement between the Department and Jefferson, the Fifth Watch was an agreed reinstatement of the Fourth Watch. Accordingly, the order of notice that preceded the Fourth Watch (see Finding #11) satisfied the statutory notice requirements for the Fifth Watch. The Court finds that the latter watch ended on September 8, 2015, and that via the 2015 Statement, the Department rendered to Jefferson an "account" for the completed watch. The Court finds that the City recorded Statement of Claim #4, which included the charges contained in the 2015 Statement, on September 21, 2015, well within the 90-day period following the City's rendering to Jefferson of the 2015 Statement. The Court finds that the amount of the City's lien for the Fifth Watch is $85,159.19. 





 Having decided the issues set for trial, the Court ORDERS the parties to appear for a telephonic status conference on November 9, 2021, at 11:30 AM, to discuss what should happen next. A separate notice of telephonic conference will issue. 





SO ORDERED. 





FOOTNOTES
[Note 1] While Whittenton's Response "[d]enied" e-mail correspondence from March 2014 between the Department and Mr. Murphy that describes the terms of the Department's agreement to end the Fourth Watch, Whittenton presented on summary judgment no admissible evidence that disputed the content of that correspondence. Thus, pursuant to Land Court Rule 4, the Court deems the contents of the March 2014 e-mail to be undisputed. 

[Note 2] This Court makes no findings that these concerns were a correct reading of the federal bankruptcy code, or that the City lacked lawful alternatives besides filing a proof of claim to enforce its claims against Jefferson. 

[Note 3] In case this holding is overturned on appeal, the Court holds that following both the 2011 and Early 2012 Watches, the City "render[ed] an account therefor" to Jefferson, via the 2013 Statement; and that by recording Statement of Claim #1 on November 8, 2013, the City satisfied the statutory requirement that such statements be filed within 90 days after an "account" for a completed abatement has been rendered. The Court further finds that Statement of Claim #1 includes $9,097.49 in expenses incurred and invoiced by the Department for the 2011 Watch, and $21,772.75 in expenses incurred and invoiced by the Department for the Early 2012 Watch. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.